JAMES G. MILLER v. THE STATE.

No. 21282.   Delivered November 27, 1940.
Rehearing Denied January 22, 1941.

The opinion states the case.

*R. C. Wilson* and *Earl Shelton,* both of Austin, and *W. C. Wofford,* of Taylor, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is robbery; the punishment, confinement in the penitentiary for ten years.

Ivan Allman, a witness for the State, testified, in substance, as follows: On November 9th, 1939, he was night watchman at Liberty Hill, Texas. At the time mentioned, appellant and two

or three companions came to Liberty Hill at night and robbed him at the point of a gun, taking his pistol and flashlight. He identified appellant, but was unable to positively identify appellant's companions. At this juncture we quote from the testimony of Mr. Allman, as follows:

"When I came up to the light at the station I saw the defendant, James G. Miller, again, and I got a good view of him there. I got a good enough view of him to swear on my oath that the defendant, James G. Miller, was there that night. When I turned around the first thing that was said to me was: 'Get your hands up!' He told me to 'turn around, but don't look at me.' The man with the gun said that; said to stick them up and turn around. I put my hands up and turned around. There was a pistol being pointed at me, I knew that. They asked me did I have a gun, and I told them 'Yes.' They took that gun off of me; and they took my flash light. While I had my hands up they marched me a little piece from the station north to the corner of station and put some tape over my eyes; they were about the corner of the station then. I do not know which one put the tape on me; I was facing north and they were behind me. I do know there was some tape put on my eyes, several strips of tape. I could not see out then when they put that tape on. They did not put any padding under the tape. They first put on just one narrow strip that hung down, and they fooled around and put some more on; they put several strips across my eyes and I couldn't see; that tape went just across my eyes, not completely around my head; and they put my hands behind me and tried to tape them, but the tape wouldn't stick; that was when both of them were present, and still at the northwest corner of that building; then they took me to the corner of the little ice house on the north end; there were no lights around there; it was dark. They asked me who slept in the Faust Cafe; the Faust Cafe is down the middle of the street on the west side. At a certain angle, looking through the window of the cafe you could see a bed in there—any one passing there in the daytime could see it; they asked me if any one slept in there and I told them I thought Mr. Faust laid down on the bed in there in the daytime; they asked me if any one else was in any of those buildings and I told them 'No,' Those two men separated there, and one stayed there with me. When they parted there they asked me if anybody else was sleeping in those buildings in town and I told them 'No.' And one of them said to the other 'If you hear a racket just kill the son-of-a-bitch and come on.' After that was said one of the men

left, and shortly after that I heard some unusual noises; the first noise that I heard was back west of me and at Adams Store straight across the street; I heard a crash over there; it made a terrible racket; and after that first noise I heard one other noise. While I was tied up there at the ice house some man came up there and said 'Bring him on,' and they took me up the street in front of Hickman's Store. Knowing the town, I knew about where I was; in walking there every night I could pretty well judge the distance. I knew where the safe was in Hickman's Store; I had seen it prior to that night; when they took me inside in a little while I heard an unusual noise; they set me down behind the counter, and they commenced making a racket in there; they were hammering on something, hammering on some kind of steel or iron. I knew where the safe was in there and I told this boy that they couldn't get by with it, that there was a man living in behind of the store in a house back there; I told the man that was guarding me that, and he called a fellow up and told him about it. At that time they had not re-taped my hands; then they took me back to the old rock building. I know how the walk is, and I can swear to this jury that they took me back to the old rock building—I know, because the floor is uneven; that's where they took me and left me. I couldn't say how many men took me up there; I know there was one or more that went up there with me; when they got me in the rock building they sat me down in a corner, the northwest corner, the front of the far side. I do not know, and it would be hard to say how long it was from the time they first taped me at the ice house until they took me to Mr. Hickman's store. Then they brought me back over there to that rock building and put me in the northwest corner; one of the men stayed with me then; it was Miller; I know it was Miller from his voice in talking to him. In all I was taped something like two hours, from the time they first taped me until they left me. I figure it was sometime after one o'clock. That was the only place they took me when they took me to the rock building. I heard some other noises there that night; it was several times I heard the crash of a front door it seemed like was taking place. When the man with me finally left me, another man did not come up to me—when they finally parted from me; I just got up and left. When we parted, after so long a time, one of the men came into the building and the other one stayed on the outside, and they laid me down in the lefthand corner; they made a pretty good job of taping me at that time; that tape stuck; they put tape on my eyes, and they taped my mouth up; it went around like that—right across my mouth there. They did not put anything

in my mouth. They did not tape my feet. The taping of my hands behind my back, I did not get my hands free right then. When they left me, one of them said one of them was going to stay with me—he said 'You stay here with him, while I get the car.' And he told me I wouldn't get hurt if I didn't try to get up, if I would lay down. I don't remember what they said they would do to me if I did get up; they left the impression with me that I had better stay down. They finally left me there. I stayed down there a few minutes before I finally got up."

Again, we quote from the testimony of the witness as follows: "Two men walked up there with me to the Sinclair Filling Station; the two men was all that I saw there; but later on, in Hickman's Store, one man was in the back of the store and one man was with me, and I saw the bulk of a third man; as I turned my head I could see a little light, and I could see the bulk of a man. I believe there were three men up there at that time. The defendant, James G. Miller, was present there at that time; I know he was present because I saw him and recognized him, both. My identification of him now is from what I saw that night, and his voice, too. Both of them together. I was fellow up and told him about it. At that time they had not with him some little while, and we were talking."

The testimony of the State was to the further effect that on the night of the robbery Logan's Drug Store in Liberty Hill was burglarized and a quantity of merchandise taken therefrom. Some of this property was circumstantially placed in the possession of appellant in Austin.

Appellant failed to testify. However, he introduced witnesses whose testimony raised the issue of alibi.

Bills of exception 1 to 5, inclusive, relate to appellant's objections to proof that several business houses in the town of Liberty Hill were burglarized on the night of the robbery. These bills of exception are qualified by the court to the effect that the burglaries in question constituted part of the res gestae, and, further, that the proof of such burglaries was deemed by the court to be admissible to combat appellant's defensive theory of alibi. It is shown in bill No. 1 that the manager of Adams Grocery Store in Liberty Hill testified, over appellant's objection, that on the night of November 9th or in the early morning of November 10th his place of business was burglarized and some money and other property taken therefrom. Bill No. 2 shows that the proprietor of the Purser Grocery Company in Liberty Hill was permitted to testify, over appellant's objection,

that his place of business was burglarized on the night of the robbery and a small amount of money taken from the cash register. C. F. Hickman of the Hickman Grocery Company of Liberty Hill gave testimony showing that his building had been entered and the knob of his safe knocked off. Mr. Faust, who operated the Faust Cafe in Liberty Hill, gave testimony showing that his building had been burglarized on the night of the robbery and some money and cigarettes taken therefrom. Mrs. Logan, of the Logan Drug Store in Liberty Hill, gave testimony showing that her husband's store had been burglarized on the night of the robbery and certain property taken therefrom.

It is manifest that the testimony of Mrs. Logan was admissible in view of the fact that some of the property taken from the Logan Drug Store was circumstantially traced to the possession of appellant. Proof that such store had been burglarized was clearly admissible to combat appellant's defensive theory of alibi, and to identify him as one of those participating in the robbery of Allman. As to the proof that Mr. Hickman's Store had been entered on the night of the robbery, it is observed that the witness Allman testified without objection that he was taken to the Hickman store with the robbers and while in the store with the robbers heard hammering "on some kind of steel or iron." Again, the witness testified that appellant was in Hickman's store with him. In short, his testimony also served to identify appellant as one of the participants in the robbery, and therefore combated the theory of alibi. He had better opportunity, by virtue of being with the appellant in Hickman's Store, to make positive his identification of him. Under the circumstances, Mr. Hickman's testimony that his building had been entered and a knob knocked off of the safe was admissible. As to the testimony relative to the Faust Cafe, the witness Allman testified without objection that the robbers carried him to the front of the building and asked him whether anyone slept in a bed that was in the cafe. As to the burglary of Adams Store, the witness heard noises in that direction which sounded like the store was being entered. The remaining buildings which had been entered on the night of the robbery was not shown in the testimony of Allman to have been burglarized. We refer to the Purser store. It is noted that the witness Allman testified that the robbers asked him whether any of the places of business in Liberty Hill were occupied during the night. He replied in the negative. It is also observed, according to the testimony of the witness, that appellant guarded him during the time that he (the witness) heard noises in town which sounded like

buildings were being broken into. During the time appellant was guarding the witness it was witness' version that he recognized the appellant's voice. He was thus afforded further opportunity for making certain his identification of the appellant. It might be plausibly contended that the testimony touching the burglaries and that relative to the robbery was as to a composite transaction, and that the crimes "were intermixed, or blended with one another, or connected so that they formed an indivisible criminal transaction," to the extent that "full proof by testimony, either direct or circumstantial, of any one of them could not be given without showing the others." If that be true, evidence of such crimes was admissible against appellant for the reason that such evidence constituted a detail of the whole criminal scheme. See Claxton v. State, 4 S. W. (2d) 542. However, we leave the question last suggested undecided and content ourselves with holding that, under the entire record, the receipt of testimony of the owners of the buildings that had been entered, if erroneously received, was harmless. We say this in view of the testimony of Allman, which was unobjected to, showing in detail the activities of the robbers in relation to the burglaries in question.

Bill of exception No. 7, as qualified, does not show that the following argument by the district attorney was a reference to the failure of the appellant to testify:

"Now, Mr. Stuart also stated there was some kind of a receipt book here, showing the number of the apartment, the date alleged to have been used, and the amount of money paid, and I wish I knew who stayed in Apartment Number Twenty-four that night, but how can you find out if we haven't got this card here? How are we ever going to find it? If I ever found the man that stayed in Apartment Number Twenty-four I would give you the receipt that was issued off of the front of that thing there. I would give you the receipt."

The court says in the qualification that it was manifest that the district attorney did not take the position that appellant was present in apartment No. 24 in Houston on the night of the robbery. When we advert to the statement of facts we find that it was the position of the State that appellant had not occupied such apartment, but that it had been occupied by some other person. It would seem to follow that the remarks of the district attorney went no further than to advise the jury that if he could find the man who occupied the apartment and obtain the receipt he was given by the proprietor of the Blue Bonnet

Court he would give such receipt to the jury. We think it is manifest that the argument did not directly, nor by necessary implication, constitute a reference to the failure of the appellant to testify.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

BEAUCHAMP, Judge.

The questions presented on the motion for rehearing in this case are not without their difficulties. However, the original opinion discussed all of them thoroughly, and, regardless of what else might be said, we think that correct conclusions were reached on good reasoning.

The motion for rehearing is overruled.